Filed 10/4/22  P. v. Sudduth CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CEPHUS EARL SUDDUTH,<br><br>    Defendant and Appellant. | B316825<br><br>(Los Angeles County<br>Super. Ct. No. BA110927) |

APPEAL from an order of the Superior Court of Los Angeles County.  Lisa B. Lench, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1996, defendant and appellant Cephus Earl Sudduth was convicted by a jury of first degree murder (Pen. Code, § 187, subd. (a)),[1] finding true the robbery-murder and kidnapping murder special circumstance allegations (§ 190.2, subds. (a)(17)(A) & (B)). It also convicted him of second degree robbery (§ 209, subd. (b)), kidnapping for robbery (§ 209, subd. (b)), kidnapping for ransom (§ 209, subd. (a)), attempted first degree robbery (§§ 664/211), and first degree robbery (§ 211). The jury also found true that the victim of the kidnapping for ransom suffered bodily harm and death or was intentionally confined in a manner that exposed her to a likelihood of death. (§ 209, subd. (a).) As for five of the counts, the jury found true a principal armed with a firearm enhancement (§ 12022, subd. (a)(1)) and a personal use of a firearm enhancement (§ 12022.5, subd. (a)). As for three of the counts, the jury found true a personal use of a deadly weapon enhancement (§ 12022, subd. (b)). He was sentenced to life in state prison without the possibility of parole.

Sudduth appealed, and on January 21, 1999, we directed that Sudduth's sentence on the kidnapping for ransom charge be stayed, and affirmed the judgment. (*People v. Cloud* (Jan 21, 1999, B109271) [nonpub. opn.], at p. 34.)

In August 2020, Sudduth filed a petition for resentencing pursuant to former section 1170.95.[2] Over the People's opposition, the trial court found that Sudduth had established a

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

prima facie case for relief, issued an order to show cause, and held an evidentiary hearing pursuant to former section 1170.95, subdivision (d).

After the evidentiary hearing, at which no party introduced new evidence, the trial court denied Sudduth's petition. Sudduth timely filed a notice of appeal. Relying principally upon *People v. Clements* (2022) 75 Cal.App.5th 276, he argues that the trial court's order must be reversed because the trial court erred in relying upon the recitation of facts in our prior appellate decision.

We affirm.

## FACTUAL BACKGROUND

"On the evening of February 21, 1995, Robert Davis [Davis] drove to the Hawthorne home of 'Damont' to discuss the purchase of a 'boom box.' [Sudduth, Herman St. Amie (St. Amie), Kenyon Pitts (Pitts), Ronald Cains (Cains), Marcell Cloud (Cloud) (collectively, St. Amie, Pitts, Cains, and Cloud are referred to as Sudduth's codefendants], Wadrick Bouligny [Bouligny] and others were present in the area near Damont's home. Davis obtained the 'boom box' from Damont and left the area to test it. When he returned later in the evening to purchase the item [Sudduth, his codefendants,] and Bouligny were still in the area.

"After paying Damont, Davis approached the yard where Sudduth, Cains, Cloud and St. Amie stood. Pitts and Bouligny were in Pitts's Chevrolet which was parked nearby. Sudduth pulled out a knife or screwdriver, placed it against Davis's abdomen and ordered him to empty his pockets. After obtaining $300 from Davis, Sudduth repeatedly demanded more money. Cloud held Davis as a pillowcase was placed over his head. Then he was beaten by several people, receiving blows to his head and

3

abdomen until he agreed to give his assailants anything they wanted.

"Cains and St. Amie dragged Davis, whose head was still covered by the pillowcase, across the street and placed him in the back seat of his Datsun. St. Amie and Sudduth also entered the car. Cains and Cloud entered Pitts's Chevrolet, where Bouligny was already seated, and told Pitts to follow the Datsun. When Pitts asked why, Cloud stated they were following the Datsun so that 'he [Davis] could get his money.'" (*People v. Cloud, supra*, B109271, at pp. 3–4.)

The two cars proceeded to a house where Davis once lived. "St. Amie parked the Datsun in the alley behind the house while Pitts parked the Chevrolet nearby. Cloud and Cains left the Chevrolet and joined Sudduth, St. Amie and Davis in the alley." (*People v. Cloud, supra*, B109271, at p. 4.) When the assailants learned that Davis did not have money at this location, Davis indicated that his girlfriend lived in Inglewood and that they could go to her house and see if she had any money. (*Id.* at p. 5.) "The pillowcase was again placed over Davis's head, he was placed in the front seat of the Datsun and the two cars proceeded to" Sonja Spencer's (Spencer) house, where she "lived with her four children, three of whom were fathered by Davis." (*Ibid.*)

"Davis, Sudduth and St. Amie approached Spencer's residence while Cains and Cloud stood in the driveway and Pitts remained in the Chevrolet." (*People v. Cloud, supra*, B109271, at p. 5.) While Spencer's daughter was getting Spencer, Sudduth and Davis searched for money in Spencer's bedroom. When Spencer saw what was happening, Sudduth forced her onto her knees with her hands behind her head and ordered her to be quiet. "At Sudduth's direction, Cloud obtained a knife from the

4

kitchen and handed it to him.  Sudduth held the knife to Spencer's throat."  (*Ibid*.)  "Cains stood guard at the door to the back bedroom to prevent any of Spencer's children from escaping through the window."  (*Ibid*.)

"As the search continued, Davis was also forced down onto the living room floor next to Spencer.  Davis was kicked and hit, and fell."  (*People v. Cloud, supra*, B109271, at p. 6.)  Spencer and Davis were repeatedly threatened.  (*Ibid*.)

"Davis then suggested they go to his mother's Lancaster home where he claimed there were a couple of thousand dollars."  (*People v. Cloud, supra*, B109271, at p. 6.)  Before leaving Spencer's residence, Sudduth asked Davis at gunpoint whether the children were his.  When Davis stated they were, Sudduth ordered him to get seven-month-old Jainah, intending to take her with them.  "Spencer, who was extremely frightened, got the baby, wrapped her in a blanket, prepared a bottle for her and gave her to Davis.  The men told Spencer they would kill Davis and the baby if they did not get money.  They also told her that if she called the police they would return to the house and kill her and the other children."  (*People v. Cloud, supra*, B109271, at p. 6.)

"Outside of the residence, Davis and the baby, Sudduth and St. Amie entered the Datsun, while Cloud and Cains joined Pitts and Bouligny in the Chevrolet.  The two cars proceeded to a nearby gas station where Pitts purchased gasoline for the Chevrolet.  Sudduth and Cloud stated they were going to Lancaster to get money and that they were keeping the baby as security until they got it."  (*People v. Cloud, supra*, B109271, at p. 6.)

"The two cars then proceeded to Lancaster where they stopped behind a bowling alley. Everyone except Pitts and Bouligny got out of the cars and discussed what they would do when they reached the home of Davis's mother. They agreed that some of them would enter the home while others remained outside and that the baby, Jainah, would be kept in the Chevrolet as security against anyone calling the police. Cloud stated the baby would be returned when [Sudduth and defendants] got the money." (*People v. Cloud*, *supra*, B109271, at p. 6.)

"The baby was placed unrestrained on the back seat of the Chevrolet and the cars proceeded to the home of Davis's mother." (*People v. Cloud*, *supra*, B109271, at p. 6.) Davis's sister saw the men approaching the home and called 911; as he entered the home, Sudduth ordered her to get off the telephone. (*Id*. at p. 7.)

"At a little after midnight, Los Angeles County Sheriff's units responded to [the] emergency call. Deputies Bower and Roth drove past [the] house in an unmarked vehicle and saw the Datsun parked in front. They also saw the Chevrolet parked nearby with several Black males inside. Deputy Bower noted that some of the men in the Chevrolet ducked as the police car passed.

"The unmarked unit joined marked patrol units . . . and Deputy Bower related her observations to her fellow deputies. Meanwhile, Cloud had ordered Pitts to follow the unmarked unit. As they passed [the] deputies' location, the occupants of the Chevrolet stared at the officers in surprise. Pitts panicked and turned into the opposite lane of traffic, causing the Chevrolet to hit the center divider and stop." (*People v. Cloud*, *supra*, B109271, at p. 7.)

6

"Pulling in behind the Chevrolet, the officers ordered the occupants to raise their hands and the driver to get out of the car. Pitts emerged from the car and walked back toward the officers as Cloud and St. Amie ordered him to get back in and drive. Suddenly, Pitts turned and jumped back in the driver's seat. He drove over the center divider into a traffic lane as Cloud and St. Amie yelled from the back seat, "'Drive. Drive. Drive.'" The Chevrolet sped off with the baby lying unsecured on the seat between Cloud and St. Amie." (*People v. Cloud*, *supra*, B109271, at p. 8.)

Sudduth and Cains, were still in Davis's mother's home when they heard officers order their companions to "'freeze.'" (*People v. Cloud*, *supra*, B109271, at p. 8.) Sudduth and Cains ran out the front door. (*Ibid*.)

"Meanwhile, the occupants of the Chevrolet engaged the officers in a high speed chase, reaching speeds of 70 to 80 miles per hour on city streets, through stop signs and traffic lights until they left Lancaster, when their speed increased to 100 to 120 miles per hour. When they turned the headlights off, the police units backed off as the area was very dark with no artificial lighting. The Chevrolet continued, weaving from side to side of the road with its headlights on only intermittently until it hit a dip in the road, went airborne for a long distance and crashed." (*People v. Cloud*, *supra*, B109271, at p. 8.) Janiah "died as a result of the traumatic internal injuries to her chest, abdomen and head which were sustained in the crash." (*Ibid*.)

7

## PROCEDURAL BACKGROUND

### I. *Former Section 1170.95 Petition*

On August 31, 2020, Sudduth filed a petition to be resentenced pursuant to former section 1170.95.[3] He averred that because he had been convicted of murder under either a felony murder theory or the natural and probable consequences doctrine, he was entitled to resentencing relief.

### II. *The People's Opposition*

The People opposed Sudduth's petition. The People argued, inter alia, that the special circumstance findings rendered Sudduth ineligible for relief and that Sudduth would still be convicted of first degree murder under current law because he was a major participant in the underlying crimes of robbery and kidnapping who acted with reckless indifference to human life.

### III. *Hearing on Sudduth's Petition and Trial Court Order*

On June 18, 2021, the trial court held a hearing to determine whether to issue an order to show cause. After entertaining oral argument, it determined that Sudduth had made a prima facie case for relief and issued the order to show cause.

At the evidentiary hearing on November 18, 2021, no party introduced new evidence. Rather, counsel offered argument as to whether the petition for resentencing should be granted.

---

[3]    St. Amie, Pitts, Cains, and Cloud separately filed petitions for resentencing pursuant to former section 1170.95. In October 2020, the trial court denied their petitions. They appealed, and we affirmed the trial court's order denying their petitions for resentencing. (*People v. St. Amie* (Mar. 10, 2022, B308633) [nonpub. opn.], at p. 2.)

8

After taking the matter under submission, the trial court issued a written order denying Sudduth's petition.  In so ruling, the trial court noted that no new evidence was presented at the evidentiary hearing and that the facts set forth in our prior opinion "have not been disputed for purposes of the instant petitions."  It then summarized the facts from *People v. Cloud* and discussed Sudduth's particular role in the underlying felonies leading up to the murder.

## DISCUSSION

### I. *Relevant law*

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Sen. Bill 1437) was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1, subd. (f).)  To accomplish this, Sen. Bill 1437 amended sections 188 and 189.  (Stats. 2018, ch. 1015, §§ 2-3.)  As amended, section 188 provides:  "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)  As added by Sen. Bill 1437, section 189, subdivision (e), provides:  "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted,

9

counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life." (See *People v. Ramirez* (2019) 41 Cal.App.5th 923, 928.)

Sen. Bill 1437 also added former section 1170.95, now section 1172.6, which provides a mechanism whereby people "who believe they were convicted of murder for an act that no longer qualifies as murder following the crime's redefinition in 2019[] may seek vacatur of their murder conviction and resentencing by filing a petition in the trial court." (*People v. Drayton* (2020) 47 Cal.App.5th 965, 973, overruled in part on other grounds in *People v. Lewis* (2021) 11 Cal.5th 952, 963.)

In order to obtain resentencing relief, the petitioner must file a facially sufficient section 1172.6 petition. (§ 1172.6, subds. (a)(1)-(3), (b)(1)(A).) If a petitioner does so, then the trial court proceeds to section 1172.6, subdivision (c), to assess whether the petitioner has made a prima facia showing for relief, thereby meriting an evidentiary hearing. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 957.) When making this determination, "the trial court should assume all facts stated in the [former] section 1170.95 petition are true. [Citation.] The trial court should not evaluate the credibility of the petition's assertions, but it need not credit factual assertions that are untrue as a matter of law . . . . [I]f the record 'contain[s] facts refuting the allegations made in the petition . . . the court is justified in making a credibility determination adverse to the petitioner.' [Citation.] However, this authority to make determinations without conducting an evidentiary hearing . . . is limited to readily ascertainable facts from the record (such as the crime of

conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion (such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime)." (*People v. Drayton*, *supra*, at p. 980; see also *People v. Lewis*, *supra*, 11 Cal.5th at pp. 970–971.) In other words, a defendant is ineligible for relief only where the record conclusively shows that the jury actually relied—and the defendant's murder conviction actually rests—upon a theory of liability that is unaffected by section 1172.6.

If the trial court determines that the petitioner has made a prima facie showing of entitlement to relief, it must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subd. (c).) At the evidentiary hearing, the parties may rely upon evidence in the record of conviction or new evidence to demonstrate whether the petitioner is eligible for resentencing. (§ 1176.2, subd. (d)(3).) As is relevant to this case, section 1172.6, subdivision (d)(3), also provides that the trial court may "consider the procedural history of the case recited in any prior appellate opinion." The prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).) If the prosecution cannot meet its burden, and the petitioner prevails, he is entitled to vacatur of the murder conviction and resentencing as set forth in section 1172.6, subdivision (e).

II. *The trial court properly denied Sudduth's petition for resentencing*

The trial court properly denied Sudduth's petition for resentencing because, after the evidentiary hearing, the trial court acted as an independent factfinder and determined, beyond

11

a reasonable doubt, that he was guilty of murder under current law.[4] (*People v. Duchine* (2021) 60 Cal.App.5th 798, 813–814.)

In so doing, the trial court did not limit itself to the factual summary set forth in *People v. Cloud*, *supra*, B109271.[5] Rather, as noted in *People v. St. Amie*, *supra*, B308633, at page 8, prior to ruling on Sudduth's codefendants' petitions for resentencing, the trial court expressly noted that it was "'very familiar with the facts'" of the case and that it had "'spent an inordinate amount of time on this case and dissecting each and every participant's role and conduct.'" (*People v. St. Amie*, *supra*, B308633, at p. 8.) This comment refutes Sudduth's assertion that the trial court solely relied upon our prior appellate opinion when it denied his petition for resentencing. Furthermore, to the extent the trial court relied upon facts set forth in *People v. Cloud*, *supra*, B109271, it did so only after expressly pointing out that (1) neither party presented new evidence at the evidentiary hearing, and (2) "[t]he facts, as taken from the Court of Appeal's opinion, have not been disputed for purposes of the instant petition." And, Sudduth did not object. It follows that any

---

[4] In reaching this conclusion, we do not adopt the People's argument that the jury's true finding on the special circumstance (§ 190.2, subd. (a)(17)) precluded Sudduth from making a prima facie case for relief under Sen. Bill 1437. (See *People v. Strong* (2022) 13 Cal.5th 698, 721.)

[5] Thus, the holding in *People v. Clements*, *supra*, 75 Cal.App.5th at page 292 that "the Legislature has decided trial judges should not rely on the factual summaries contained in prior appellate decisions when a [former] section 1170.95 petition reaches the stage of a full-fledged evidentiary hearing" does not compel reversal in this case.

challenge to them now has been forfeited. (*People v. Smith* (2001) 24 Cal.4th 849, 852 ["As a general rule, only 'claims properly raised and preserved by the parties are reviewable on appeal'"].)

**DISPOSITION**

The order denying Sudduth's former section 1170.95 petition is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT